## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| In Re: | Case No.:  12-46965-GFK |
| Steven F. Meldahl, | Chapter 11 |
| Debtor. | |

## OBJECTION OF TCF NATIONAL BANK TO MOTION
## TO DETERMINE VALUATION OF REAL PROPERTY

TO:  Debtor Steven F. Meldahl and his counsel Steven B. Nosek and all parties in interest.

1.  TCF National Bank ("TCF"), an unsecured creditor of the debtor Steven F. Meldahl

    ("Debtor"), makes the following objection to the motion of the debtor to determine the

    value of 88 separate properties.

### BACKGROUND

2.  The Debtor filed for relief under chapter 11 of the Bankruptcy Code on December 12,

    2012.

3.  On January 10, 2013, less than a month after the commencement, the Debtor filed a

    Motion for Order Determining Valuation of Real Property (the "Motion").

4.  The Motion asks this court to determine the value of 88 separate pieces of real property

    located primarily in Minnesota, but also including four properties in Florida.

5.  The Motion seeks to lock into place for all purposes values based on the Debtor's

    estimate of value for each property.  The Motion specifically states any portion of any

    claim over and above the value stated in the Motion should be allowed only as unsecured

claims.  The Motion further states the determination of the value will affect the validity and amount of liens.

6. In support of the Motion, the Debtor provided nothing more than the unsupported statements of value based on the Debtor's opinion of value.  The Debtor did not provide any methodology or support for how the valuation advanced by the Debtor was determined.  The Motion relies on the "common knowledge" that the value of real property has been reduced.

7. The Debtor listed himself as the only stated witness.  The Motion states the Debtor intends to call "an appraiser and/or realtor familiar with the values of the properties owned by the Debtor."  The Motion does not state who that witness or witnesses might be, how to contact that witness, or the substance of the testimony of the proposed witness as required by Local Rule 9013-2(c).

8. On May 24, 2006, Debtor, individually, in his individual capacity, entered into a Real Estate Secured Variable Rate Agreement and Disclosure OPEN END (CommandCredit Plus® – Home Equity Line of Credit Agreement and Disclosure Statement) (the "Note") with TCF, in the original principal amount of $500,000.00.

9. Defendant Steven F. Meldahl, in his capacity as Trustee under the Steven F. Meldahl Living Trust Dated May 18, 2001, also executed the Note as collateral owner.  A true and correct copy of the Note is attached hereto as Exhibit A.

10. To secure payment of the Note, Steven F. Meldahl, as Trustee under the Steven F. Meldahl Living Trust Dated May 18, 2001, executed and delivered to Plaintiff, as mortgagee, a mortgage dated May 24, 2006, and filed of record in the Office of the Registrar of Titles, Hennepin County, on June 27, 2006, as Document No. 4276178 (the

"Mortgage"), encumbering fee title to the real property in Hennepin County owned by Mortgagor and described as follows:

Lot 6, Block 1, Hyde Park Second Addition, Hennepin County, Minnesota.

A true and correct copy of the Mortgage is attached hereto as Exhibit B.

11. TCF is owner and holder of the Note and Mortgage, and is entitled to all rights, title and interest created or evidenced thereby; as holder of the Mortgage, Plaintiff is entitled to enforce the same as mortgagee.

12. Debtor failed to make the principal and interest payments due under the terms and conditions of the Note and Mortgagor defaulted under the terms and conditions of the Mortgage beginning in April 2011; Debtor thereafter continued, and has continued, to fail to make such principal and interest payments as have been due under the terms and conditions of the Note and the Mortgagor continued, and has continued, to default under the terms and conditions of the Mortgage.

13. The amount outstanding under the Note and Mortgage as of November 14, 2012, was $559,437.54, comprised as follows: principal balance of $496,712.99, accrued and unpaid interest in the amount of $61,935.15 through November 14, 2012, and charges of $789.40 through November 14, 2012.  Interest thereon continues to accrue at the rate of $90.06 per day, plus the fees and costs incurred by TCF.

14. While the Debtor executed the Note for the property, the record owner is a trust, not the Debtor. Accordingly, TCF will be the largest unsecured creditor with a claim in excess of $560,000.00.

15. The Debtor seeks to establish the value of more than 80 properties by Motion at the very start of this bankruptcy case before any creditors committee has been formed and before creditors have had an opportunity to fully evaluate the bankruptcy case.

16. The Motion is to be heard less than 60 days after the filing. The Debtor has provided no reason for having this determination made now on all these properties. In the Motion the Debtor, in emphasized language, states that the intent is to arrive at a value of the properties allowing the debtor through its chapter 11 plan to strip off or reduce the liens of any creditors that are not secured due to the value of the debtor's properties.

17. Taking away the property rights of a lienholder is a taking which requires procedural due process to be provided to the lienholder. The Motion of the Debtor fails to provide the minimum due process required by the Fifth Amendment before depriving any creditor of its property right.

18. The Debtor also states he wants to determine the value of the property for property tax purposes.

19. As a court of limited jurisdiction, the bankruptcy court lacks jurisdiction to determine the tax value of real property under Minnesota law and 28 U. S. C. §§ 157 and 1334.

20. The Debtor has been less than candid with this court in these proceedings.

21. The Debtor has listed monthly income in his Statement of Income, page 60 of the completed schedules. The Debtor was required to list his actual income and expenses for the last six months. His income for the last six months has been unvaryingly $13,143.00 each month. His monthly expenses have been exactly $13,143.00 each month.

22. The Debtor testified at the meeting of creditors his monthly rental income was between $65,000.00 and $85,000.00 a month and his rental expenses were between $35,000.00

4

and $50,000.00 a month.  This leaves the Debtor with between $15,000.00 and $50,000.00 in net income each month.

23. The Debtor listed himself as self-employed.  If this is true his income and expenses are substantially greater than he reported.

24. The Debtor listed his household goods as worth $1,000.00.  The Debtor lives in a house he values at almost one million dollars.  His claimed value for his household goods is simply not credible.

25. The first operating report which was filed by the Debtor listed a $500.00 payment to his daughter's credit union account, allegedly for school expenses.  There are no financial controls in place and the Debtor is free to spend the income of the estate in any way he determines.[1]

26. Debtor lists himself as the owner of all 88 parcels of real estate.  The property records for Hennepin County show that more than 30 of the properties listed as property of the estate are not owned by the Debtor in his own name.

27. The Debtor testified he has transferred those properties back from a a trust into his own name, but the records do not support that proposition.

## ARGUMENT

### I.    THE MOTION IS PREMATURE AT THIS TIME.

The Debtor is trying to lock in values before the court or creditors know what will happen with the properties.  While 11 U. S. C. § 506 permits the court to determine the secured status of an allowed claim, the determination is to be made "…in light of the purpose of the valuation and

---

[1] It may very well turn out the Debtor is using cash collateral without court approval by using post-petition rental proceeds which may be subject to the interests of any mortgagee holding a valid assignment of rents provision in their mortgages or deeds of trust.

of the proposed disposition or use of such property…" 11 U. S. C. § 506(a)(1).  The Debtor has

proposed no plan and has not disclosed intended use of these properties.  The value of the

properties could vary significantly depending on the disposition of the property in this chapter 11

case.  The liquidation or quick sale value might be far less than the value of the property if the

Debtor proposes to retain the property and continue to earn income from it.  In re Alpine Group,

Inc., 151 B. R. 931, 24 Bankr. Ct. Dec. 157, Bankr. L. Rep. P 75,233 (B.A.P 9th Cir. 1993).

Further, any valuation determined at this time is subject to further review in the future

based on any changes in circumstances and ultimate use of the property by the Debtor in the

future.  In re Cason, 190 B. R. 917 (N.D. Ala. 1995); In re Byrd, 250 B. R. 449, 1 (Bankr. M.  D.

Ga. 2000).  The only relevant purpose for valuation at this point in the case is to determine what

constitutes adequate protection for any specific lien holder.  Those issues can be best resolved in

the context of a lift stay or adequate protection motion or when the Debtor files a plan of

reorganization.  In the future creditors will be entitled to seek a new valuation based on the

disposition of the property as proposed in the plan.   The estates resources should not be depleted

by allowing the Motion to go forward at this time.

## II.    DUE PROCESS REQUIRES THE APPLICATION OF DISCOVERY RULES.

In the event the court permits the Motion to proceed there must be adequate provisions to

protect all party's interests.  The Motion's stated purpose is to determine the validity and amount

of various liens against the real property.  Rule 7001 of the Federal Rules of Bankruptcy

Procedure provides that an adversary proceeding is necessary to determine the validity, priority,

or extent of a lien or other interest in property.  An adversary proceeding provides the

appropriate procedural structure for the litigation of the issues raised by this Motion.  While

Bankruptcy Rule 3012 may allow the court to value property for a specific purpose, the rule the

court must give those creditors the right to fully present their claims after appropriate discovery. The appropriate method for invoking Section 506 of the Bankruptcy Code is to commence an adversary proceeding. This provides the procedural safeguards to allow the creditors to examine the validity of the values advanced by the Debtor and to develop the evidence to contest that valuation.

The Debtor brought the Motion for the purported purpose of reducing or eliminating the secured claims of the creditors with liens on the properties. The liens of these creditors are property rights of those creditors must be granted due process rights. The property of the creditors cannot be taken without due process of law. This means the creditors must be given a chance to argue and present evidence against the values claimed by the Debtor. Further, there exists a substantial question concerning the actual ownership of the properties and whether they are property of the estate.

The Debtor has provided no bases for the valuations he provided in Exhibit A to his Motion for valuation. It appears from the motion papers that the Debtor simply picked numbers out of the air. While the Debtor may have a valid explanation for the method he used, it was not disclosed to creditors or the court. The creditors are entitled to explore the valuation methodologies employed by the Debtor.

Additionally, the Debtor wants to call "unnamed" witnesses to meet his burden of proof. The creditors are entitled to know who those witnesses may be and to examine the bases for their opinions on value and to challenge their expertise in such matters. Only by thorough and complete discovery can the due process rights of the creditors claiming a lien on the property be protected. The Debtor should be required to provide expert disclosures to allow for examination of these witnesses.

Even taking this as a contested matter, Bankruptcy Rule 9014(c) makes applicable various rules under Part VII of the Federal Rules of Bankruptcy Procedure. These include the right to do discovery. The hearing on February 5, 2013 will not provide the creditors and specifically TCF with the opportunity to use discovery before the hearing. The court should establish a discovery schedule which will allow the creditors to do the discovery necessary to fully litigate this issue. Given the large number of properties and the lack of adequate disclosure by the Debtor of its witnesses and valuation methods, TCF believes at least 120 days are necessary to serve discovery, receive responses, hire its own experts, depose any experts proffered by the Debtor and prepare its case for hearing.

## III.    THERE ARE FACTUAL DISPUTES REGARDING THE DEBTOR'S VALUATIONS.

The Debtor submitted his estimate of value for each of these properties. The values he has placed on the property are, in most cases, drastically different than the values placed on the properties by the Hennepin County taxing authority. Attached as Exhibit C is a comparison between the values listed by the Debtor for his Hennepin County property and the Hennepin County tax value for each property (two properties 3335 Oliver and 2622 Irving had no listed tax value). As can be seen from Exhibit C, there is a total difference in values of $1,831,200.00. The total of the listed secured claims on Schedule D is $2,901,119.00 and the total listed unsecured claims in Schedule F is $384,870.16. Assuming these numbers are correct after all claims are filed, there is sufficient equity to pay all creditors in full. The amount of the difference between the Debtor's valuation and the tax valuation is enough to pay all unsecured creditors. In any case, there is sufficient cause to raise a factual dispute as to the values placed on the property by the Debtor and to warrant giving the creditors the opportunity to fully litigate this issue if necessary.

8

## IV.   JURISDICTION TO DETERMINE TAX VALUATION IS LACKING.

The taxing authority of Hennepin County arises under state law.  Minnesota has a tax

court established by statute.  Minn. Stat. chapter 271.  Only the Tax Court can hear and

determine disputes regarding the tax laws of this state.  Minn. Stat. §271.01, subd. 5 provides:

Subd. 5. Jurisdiction.

The Tax Court shall have statewide jurisdiction. Except for an appeal to the supreme court or any
other appeal allowed under this subdivision, **the Tax Court shall be the sole, exclusive, and
final authority for the hearing and determination of all questions of law and fact arising
under the tax laws of the state, as defined in this subdivision, in those cases that have been
appealed to the Tax Court and in any case that has been transferred by the district court to
the Tax Court**. The Tax Court shall have no jurisdiction in any case that does not arise under the
tax laws of the state or in any criminal case or in any case determining or granting title to real
property or in any case that is under the probate jurisdiction of the district court. The small
claims division of the Tax Court shall have jurisdiction only as provided in section 271.21,
subdivision 2. The Tax Court shall have no jurisdiction in any case involving an order of the
state board of equalization unless a taxpayer contests the valuation of property. Laws governing
taxes, aids, and related matters administered by the commissioner of revenue, laws dealing with
property valuation, assessment or taxation of property for property tax purposes, and any other
laws that contain provisions authorizing review of taxes, aids, and related matters by the Tax
Court shall be considered tax laws of this state subject to the jurisdiction of the Tax Court. This
subdivision shall not be construed to prevent an appeal, as provided by law, to an administrative
agency, board of equalization, review under section 274.13, subdivision 1c, or to the
commissioner of revenue. Wherever used in this chapter, the term commissioner shall mean the
commissioner of revenue, unless otherwise specified. (emphasis added).

It is clear from this provision that the exercise of authority by this court would be in clear

violation of the jurisdictional grant given to the tax courts.  Further, any determination by the

bankruptcy court would an intrusion into the comity between state and federal systems.  The

authority to tax is one of the fundamental powers of a state and the federal courts should not

interfere absent a compelling reason.

One of the apparent reasons for the Debtor to bring this Motion to value the real property

is to determine the tax value in his on-going dispute with Hennepin County.  Hennepin County

establishes a value upon which it bases the real estate taxes incurred on each property.  Pursuant

9

to the Minnesota statutes and as the Debtor noted in his Motion and in the Statement of Financial Affairs, he has been fighting with the County over the values placed on his properties. Any determination made by this court as to the value of the properties cannot bind Hennepin County.

Bankruptcy courts are courts of limited jurisdiction. They may exercise jurisdiction only over matters related to the bankruptcy and not matters which require an Article III court. Stern v. Marshall, —— U.S. ——, 131 S. Ct. 2594, 180 L.Ed.2d 475 (2011). To the extent the provisions of the Bankruptcy Code and related laws extend the jurisdiction beyond these public rights, those provisions are unconstitutional. In re Falzerano, 686 F.3d 885 (8th Cir. 2012). The resolution of tax claims arising under state law and the determination of values on which those claims are based are inherently within the jurisdiction of the state and not within the jurisdiction of the bankruptcy court. Nothing in the jurisdictional grants of authority for a bankruptcy court permits it to exercise the police or regulatory functions of the State of Minnesota.

## CONCLUSION

The Debtor appears to be trying to take advantage of the bankruptcy system by seeking a determination of value at a time and by a process which would prevent the creditors from fully participating. This attempt is objectionable for numerous reasons. Any determination of the value would not be binding when considering a plan of reorganization. This Motion is a waste of estate assets. The determination of value would not be binding on the taxing authorities and perhaps not on creditors later in this proceeding. The creditors deserve the right to a full and fairly litigated hearing on these issues if the court determines to proceed.

TCF request the court dismiss this Motion at this time and until such time as the Debtor proposes a sale or plan of reorganization regarding these properties which might necessitate the determination of the value of any piece of property. In the event the court determines to proceed

10

with this Motion, TCF requests this court establish a discovery schedule based on the scope of

the issues raised by the Debtor's Motion.

Dated this day of January, 2013.

Foley & Mansfield, PLLP

Thomas J. Lallier (#163041)
tlallier@foleymansfield.com
Foley & Mansfield, PLLP
250 Marquette Avenue, Suite 1200
Minneapolis, MN  55401
Telephone:    (612) 338-8788
Facsimile:    (612) 338-8690

**ATTORNEYS FOR TCF NATIONAL BANK**

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| In Re: | Case No.:  12-46965-GFK |
| Steven F. Meldahl, | Chapter 11 |
| Debtor. | |

### VERIFICATION

I, Monica Lash, Bankruptcy Specialist for TCF National Bank, declare, under penalty of perjury,

that the foregoing is true and correct to the best of knowledge, information, and belief.

Executed on: January 31  , 2013.

Signed:_____

REAL ESTATE SECURED
VARIABLE RATE AGREEMENT AND DISCLOSURE
OPEN END

Acct. No. -
Borrower:   STEVEN F MELDAHL
Co-Borrower:

COMMANDCREDIT PLUS® - HOME EQUITY LINE OF CREDIT
AGREEMENT AND DISCLOSURE STATEMENT

This Agreement and Disclosure Statement (this "Agreement") states the terms of your CommandCredit Plus Home Equity Line of Credit. By signing below, you agree to all the terms of this Agreement. Only those boxes that are checked apply. The date of this Agreement is 05/24/2006.

**Definitions.** "You" and "your" mean you, the Borrower, and all other persons signing this Agreement as Co-Borrowers. "We", "us", "our" and "TCF" mean TCF National Bank, 801 Marquette Avenue, Minneapolis, Minnesota 55402 and its successors and assigns. "Successor" means a legal entity or person that by law succeeds to the legal rights and obligations of TCF. "Assigns" means an entity or person to whom TCF assigns its rights under this Agreement. "Account" means your CommandCredit Plus Home Equity Line of Credit. "Account Balance" means the sum of the unpaid Principal Balance, Finance Charges, Late Charges, and Other Charges except those Other Charges we have added to your Principal Balance. "Principal Balance" means the unpaid amount of Loan Advances on your Account and any other Other Charges we add to your Principal Balance. "Check" means the CommandCredit Plus Checks provided to you. "CommandLine® Card" means the card provided to you to access your line of credit. "Loan Advance" means amounts we advance to you on your Account when you use a Check, use your CommandLine Card, request a yearly rate. Conversion or any other loan request acceptable to us, Closing Costs not paid in cash, and charges to protect our interests as described in the section on page 5 labeled "Our Other Rights". "Escrow Items" means those items described in Section 11 of the mortgage securing this Agreement. "Fixed Rate Conversion" means a request by you to convert the Annual Percentage Rate and payment schedule for all or a portion of the outstanding Principal Balance on your Account in accordance with the terms of this Agreement in the section on page 3 labeled "Fixed Rate Conversion Feature". "Finance Charge" means the interest we will charge you, figured according to the terms of this Agreement, the processing fees and conversion fees described in the "Closing Costs" and "Fixed Rate Conversion Feature" sections respectively as Finance Charges. "Closing Costs" means a cost described on page 3 in the section labeled Closing Costs. "Other Charges" means charges you owe us under this Agreement for returned payment charges, overline charges, annual maintenance fees, TCF Command Protection Line charges and check copy charges. We may add Other Charges to your Principal Balance.

**Your Promise To Pay.** You promise to pay to us your Account Balance according to the terms of this Agreement. You promise to pay us a Finance Charge calculated as described below in the section labeled "Finance Charge". You promise to pay us a monthly payment as described in the section on page 3 labeled "Payments". You shall also pay funds for Escrow Items pursuant to Section 11 of the mortgage securing this Agreement, if required. You promise to pay us your entire unpaid Account Balance by 05/29/2046, which is the final due date, in a single payment. We may also direct you to make any payment to someone else (this means this Agreement is payable to us or "our order"). We will begin charging interest on 05/29/2006. ("Interest Start Date").

**Variable Interest Rate.** The interest rate on your Account is variable and can change monthly during the term of this Agreement. Your interest rate is referred to as an Annual Percentage Rate. The Annual Percentage Rate is the cost of your credit as a yearly rate. The changes in the Annual Percentage Rate are based on changes to the Index Rate. The Index Rate is the highest U.S. prime rate published daily in The Wall Street Journal (currently under the label "Money Rates"). The highest published Index Rate each calendar month is the Index Rate that Applies to all days of each calendar month. If the published Index Rate changes during the calendar month, we will change your Annual Percentage Rate on the last calendar day of the month based on the highest published Index Rate during each month plus    the Margin described below (except as limited by the section below labeled "Minimum and Maximum Annual Percentage Rate").
On and after 05/29/2006 and through the date you pay your Account in full and this Agreement is canceled, your Annual Percentage Rate will be the published Index Rate plus 0.740 percentage points (the "Margin"). The Annual Percentage Rate will change monthly based on the published Index Rate as discussed above. The Index Rate published today is 8.000 % per year. Therefore, your beginning **"ANNUAL PERCENTAGE RATE"** for your Account (unless the Index Rate changes before the Interest Start Date) is 8.740 % per year which is equivalent to a Daily Periodic Rate of .02395 %. The Daily Periodic Rate is figured by dividing the Annual Percentage Rate by 365 (or 366, in any leap year).
If the Annual Percentage Rate increases or decreases, the Daily Periodic Rate will also increase or decrease. Any increase in the Annual Percentage Rate may cause larger Minimum Payments. The reverse will happen if the Annual Percentage Rate declines. If the Index Rate becomes unavailable, we will pick a new index rate and margin, and send you notice of the new index rate and margin. The new index rate will be the Index Rate and the new margin will be the Margin. The new index rate will have a historical relationship substantially similar to that Index Rate, and the new index rate and margin will result in an Annual Percentage Rate similar to the Annual Percentage Rate in effect at the time the Index Rate became unavailable. The Index Rate may not be the lowest or best rate offered by us or other lenders. The Annual Percentage Rate includes only interest and not other costs.
**Minimum and Maximum Annual Percentage Rate.** Your **"ANNUAL PERCENTAGE RATE"** will never be less than 8.230 %, no matter how much the Index Rate may decline. Your **"ANNUAL PERCENTAGE RATE"** will not exceed 18.000 %.

**Rate Discount for TCF Checking or Deposit Account.**
[X] The Annual Interest Rate on this Agreement as described above has been reduced by one-quarter of one percentage point (.25%) from what it otherwise would have been because you have a TCF Checking or Savings Account ("TCF Account"). If your TCF Account is closed, your Annual Percentage Rate will be increased as of the date of TCF Account closure by one-quarter of one percentage point (.25%). The rate increase will be determined by adjusting the Margin we add to or subtract from the Index Rate, as described above, by one-quarter of one percentage point (.25%) on the date of TCF Account closure and for all subsequent Annual Percentage Rate changes.

**TCF's Right to Cancel the Agreement:** You have provided us with certain information regarding the real property securing this Agreement. TCF may cancel this Agreement for fraud or material misrepresentation as described in the section titled "Possible Actions" if it discovers any of the following types of information provided to us by you in the application or on the Affidavit of Borrower or Owner is inaccurate, fraudulent or misleading in any manner, including, but not limited to omissions, fraudulent statements and errors. This includes information regarding: the ownership of any real property securing this Agreement; any mortgages, liens or other encumbrances on any real property securing this Agreement; non-payment of any items which could create liens or other encumbrances on any real property securing this Agreement; the legal description of any real property securing this Agreement; and any contracts or other agreements affecting any real property securing this Agreement.

NOTICE TO BORROWER: SEE PAGES 2, 3, 4, 5, 6, 7, 8 AND 9 OF THIS AGREEMENT FOR IMPORTANT INFORMATION REGARDING YOUR RIGHTS TO DISPUTE BILLING ERRORS AND OTHER CONTRACT INFORMATION. BY SIGNING BELOW, YOU AGREE THAT PAGES 2, 3, 4, 5, 6, 7, 8 AND 9 OF THIS AGREEMENT ARE PART OF YOUR AGREEMENT WITH US AND THAT YOU RECEIVED A COMPLETED COPY OF ALL 9 PAGES OF THIS AGREEMENT. BY SIGNING BELOW, YOU ALSO STATE THAT YOU HAVE READ AND AGREED TO ALL THE TERMS OF THIS AGREEMENT, INCLUDING THE TERMS ON PAGES 2, 3, 4, 5, 6, 7, 8 AND 9.

_____        _____
Borrower  STEVEN F MELDAHL              Co-Borrower

By signing below as collateral owner, you give us a security interest in the collateral securing this Agreement or a separate mortgage on real estate to protect us if the Borrower or Co-Borrower defaults under this Agreement. If this Agreement is secured by collateral, you agree to the terms of the Security Agreement section of this Agreement. You will have no personal obligation to repay this Agreement, but you agree that we have all of the rights in the collateral securing this Agreement as provided by this Agreement or if secured by real estate as provided in this Agreement and the mortgage. By signing below, you acknowledge you received and agree to the terms of the separate Arbitration Agreement dated the same date as this Agreement on this date.

_____        _____
Collateral Owner                        Collateral Owner
You agree that this Agreement is subject to arbitration as set forth in a separate arbitration agreement. You also acknowledge you received and agreed to the separate arbitration agreement on this date.
                                        _____ Initials        _____ Initials
                                        099160        page 1 of 9        01/31/06

EXHIBIT A

**Finance Charge.** The Finance Charge you will pay us is calculated according to this section and is figured at the end of every monthly billing cycle. The monthly billing cycle runs from and includes the first day of a month to and including the last day of that month. We figure the Finance Charge on your Account for each day of the monthly billing cycle by multiplying the Daily Periodic Rate in effect for the month times the Principal Balance for your Account as of the end of each day. The Principal Balance of your Account for each day is figured by taking the Principal Balance of your Account at the beginning of each day, adding any new Loan Advances and any Other Charges we have added to your Principal Balance that day, and subtracting any reduction in the Principal Balance due to the application of payments or credits to your Account that occurred that day. The Daily Periodic Rate for each day is figured by dividing the Annual Percentage Rate described on page 1 under the section labeled "Variable Interest Rate" for that day by 365 (or 366, in any leap year). We figure the Finance Charge for the monthly billing cycle by adding the Finance Charges for each day in the monthly billing cycle. You pay no Finance Charge on unpaid Finance Charges. The Finance Charge for both Loan Advances and any Other Charges we add to your Principal Balance begins to accrue the day they are posted to your Account. Loan Advances are posted to your Account the date we receive them. Other Charges are posted to your Account on the date we add them to your Principal Balance. No time period exists within which any credit extended may be repaid without incurring a Finance Charge. In addition, the processing fee and conversion fees are a Finance Charge and are calculated as stated in the "Closing Costs" section respectively and the "Fixed Rate Conversion Feature" section.

## SECURITY

To protect us if you default under this Agreement, or any change, extension or renewal of this Agreement:
[x] **Mortgage.** The mortgage dated the same date as this Agreement. The mortgage will be in the amount of your credit limit, and will cover the real property located at:

740 HYDE PARK DRIVE EDINA MN 55439

We will not release the mortgage until you have paid us everything you owe us under this Agreement and have canceled this Agreement. The mortgage contains additional terms regarding your and our duties and obligations.
[ ] **Security Agreement.** You give us a security interest in the following property ("collateral"):


This security agreement does not apply to personal property that is your principal dwelling if we fail to provide any required notice of right to rescind.
**Accessions and Proceeds.** To protect us if you default under this Agreement and any changes, extensions, and renewals of this Agreement, you also give us a security interest in any "accessions" to and "proceeds" of any collateral described above which will all be included in the term "collateral". "Accessions" generally means any goods installed in or attached to the collateral. "Proceeds" generally means any money or property due to you from the loss, destruction or sale of collateral. Accessions and Proceeds are defined in Article 9 of the Uniform Commercial Code.
**Ownership of the Collateral.** You represent that you and any Collateral Owner signing this Agreement have full ownership of all the collateral. You represent that no one else has an interest in the collateral, including a lien, other than an acceptable interest as to which we have been advised in writing in our inspection of title to the collateral (for example, a first-lien on your car that is already noted on the title). You agree not to sell or give anyone else an interest in any of the collateral that is personal property or give anybody else an interest in it without written permission from us. You will keep the collateral free from all other claims (such as taxes and liens). You agree to assist us and sign any documents necessary to perfect our security interest in the collateral (such as ensuring a financing statement or certificate of title documents are filed on the collateral).
**Care of the Collateral.** You will:

1.   Keep all the collateral in good repair and working order;
2.   Replace broken and worn parts;
3.   Allow us to inspect the collateral as we wish; and
4.   Notify us in writing immediately of any loss or damage to the collateral.

**Insurance.** You will keep the collateral insured against:

1.   Fire (including extended coverage);
2.   Theft and collision (for motor vehicles); and
3.   Any other risks we name.

You may buy the insurance from anyone you want, but the insurance company and the amount of the insurance must be acceptable to us. You will have the insurance company name us in the policy as a secured party, and you will give us a copy of the policy. You will instruct each issuer of an insurance policy to pay any claims directly to us and to notify us in writing at least 30 days before ending coverage. You assign any insurance payments to us as additional security. **Notice: If you do not provide us with evidence of all the insurance coverage required by your Agreement with us promptly after we ask for this evidence, we may purchase insurance at your expense to protect our interest in the collateral. This insurance may, but need not, protect your interests. The coverage that we purchase may not pay any claim that you make or any claim that is made against you in connection with the collateral. You may later cancel any insurance purchased by us, but only after providing us with evidence that you have obtained insurance as required by this Agreement. If we purchase insurance for the collateral, you will be responsible for the costs of that insurance, including interest and any other charges we may impose in connection with the placement of the insurance, until the effective date of the cancellation or expiration of the insurance. The costs of the insurance may be added to your Principal Balance. The costs of the insurance may be more than the cost of insurance you may be able to obtain on your own.**
**Our Right to Take Action.** If you do not:

1.   Take care of the collateral;
2.   Keep the collateral insured as we ask;
3.   Make sure that necessary financing statements or certificate of title documents are filed; or
4.   Fulfill any other promise you have made in this Agreement,

then we may (if we choose) take the necessary steps to protect our interest in the collateral. For example, we may pay taxes, insure the collateral, file financing statements, or make repairs.
**Location of Property.** You will not keep personal collateral in any county or state unless a financing statement has been filed there showing us as the secured party, if one is required to be filed there to perfect our security interest. You will not remove personal property collateral from the state where you currently live without our written permission. If there is a certificate of title showing title to any collateral, you will file any amendment or other documentation required to protect our security interest.
**Special Rules for Securities.** If any of the collateral consists of stocks, bonds or other types of securities:

1.   You will endorse those securities at our request so that we can transfer them. If we ask you to, you will also deliver to us anything that you receive from the issuer of those securities. For example, you will deliver any money, notices and additional securities that you receive from the issuer because you own the securities. Whatever you deliver to us will be collateral subject to this Agreement.
2.   We may notify the issuers of those securities of our security interest. We may require the issuers to make any payments to us directly, and we may sue the issuers if they do not pay as required.
3.   If your securities are issued by or held by another party, such as your broker, you will obtain from such party a signed control agreement we may require to perfect our security interest in the collateral.

ADDITIONAL TERMS OF YOUR COMMANDCREDIT PLUS® HOME EQUITY LINE OF CREDIT

**Closing Costs.** To open an Account, you promise to pay a processing fee of $475 (Finance Charge). We will defer collection of this fee at the time you open your Account. You agree you will pay this fee to us if your Account is terminated before three years from the interest start date. However, if your Account is closed due to a refinance of this Agreement with us the processing fee will be waived.
    You promise to pay the following closing costs on the date of this Agreement (if not paid in cash, we may add the costs to your Principal Balance):

---

**Payments.** At the end of every monthly billing cycle, we will calculate your Minimum Payment, which will be due by the 15th of the following month. The "Minimum Payment" is equal to the Finance Charge for the monthly billing cycle, or $50.00, whichever is greater. In addition, you promise to pay all late charges, past due amounts and unpaid Other Charges and any other amount which exceeds your credit limit described in the section labeled "Draw Period and Credit Limit". If the Account Balance is less than the Minimum Payment calculated above, then your Minimum Payment for that month is equal to your Account Balance. The Minimum Payment may not reduce the Principal Balance that is outstanding on your Account. On the final due date, you will be required to pay the entire outstanding Account Balance. This payment may be substantially higher than your monthly payment and is sometimes referred to as a "balloon" payment. All payments must be made at the address on your statement or payment coupon, or at such other address we designate in a written notice to you that states the address is for the purpose of making payments ("Payment Address"). All payments must be made in U.S. Dollars. Payments made at or delivered to any address other than the Payment Address will not be considered made until received at the Payment Address. You may prepay this Agreement at any time without penalty.
**Application of Payments.** Any payment you make to us may first be applied to any billed and unpaid late charges, then to any billed and unpaid TCF Command Protection Line charges, then to any billed and unpaid returned payment charges, then to any other billed and unpaid Other Charges you owe, then to any billed and unpaid Finance Charges, then to Escrow items, and then to the remainder of your Account Balance. To the extent your payments reduce your Principal Balance, that amount becomes available to you for Loan Advances (provided your Principal Balance does not exceed your Credit Limit). Although we apply your payments to your Account as of the date we receive them at the Payment Address, the credit available to you because of your payments will be final only on the date the funds are collected by us. All credits for payments on your Account are subject to final payment by the institution on which the payment is drawn.
**Draw Period and Credit Limit.** We will make Loan Advances to you according to the terms of this Agreement until the final due date shown on page 1 in the section labeled "Your Promise To Pay" (the "Draw Period") as long as you do not exceed your credit limit. The credit limit on your Account is $500,000.00 . You agree not to write any Check, use your CommandLine Card, or make any other loan request that would cause your Principal Balance to exceed your credit limit. We do not have to pay any Check, or authorize a CommandLine Card transaction, or make a Loan Advance that would cause your Principal Balance to exceed your credit limit, but if we do, you promise to pay us the excess as soon as we ask you to. You will owe an overline fee of $20 for each monthly billing cycle in which you exceed or attempt to, but do not exceed, your Credit Limit.

☐ **If this box is checked the following applies:**
    You agree that the mortgage you give us on the property described on page 2 of this Agreement in the section labeled "Mortgage" will be for _____ ("Original Mortgage Amount") which is greater than the initial credit limit stated above. This means that any amount you pay to third parties that is based on the Original Mortgage Amount (such as for title insurance or mortgage registration taxes) will be greater than if the mortgage was only for the initial credit limit. From time to time after the date of this Agreement, we will review your Account and may decide to increase your credit limit, but will never increase it to an amount that would exceed the Original Mortgage Amount or the then current mortgage amount if you and we have agreed to modify the mortgage amount. In addition, we may decrease your credit limit, but only for the reasons stated in the section labeled "Possible Actions" on page 4 of this Agreement. We will send you notice of the increased or decreased amount. Except for the section labeled "Mortgage" on page 2 of this Agreement, the word "credit limit", when used in this Agreement, means your initial credit limit or any increased or decreased credit limit in effect at the time. In the section labeled "Mortgage", the word "credit limit" means the "Original Mortgage Amount".

**Fixed Rate Conversion Feature.** At any time before the last 12 months of the Draw Period, you may convert the payment schedule and variable Annual Percentage Rate for any amount of Principal Balance up to the current Principal Balance (not including any previously converted Principal Balance) to a fixed Annual Percentage Rate and fully amortizing payment schedule, subject to the following terms and conditions:
- The minimum amount of Principal Balance you may request to convert is $5,000.00.
- You may request up to 3 Fixed Rate Conversions per year with no more than 3 Fixed Rate Conversions existing at any one time.
- The conversion fee for each Fixed Rate Conversion is $50 (FINANCE CHARGE).
- The unpaid Principal Balances of all outstanding Fixed Rate Conversions will reduce the amount available for other Loan Advances by the same amount. As you repay the Principal Balances on each Fixed Rate Conversion, the same amounts will once again be made available for other Loan Advances (provided your Principal Balance does not exceed your credit limit). Although we apply your payments to your Account as of the date we receive them at the Payment Address, the credit available to you because of your payments will be final only on the date the funds are collected by us. All credits for payments on your Account are subject to final payment by the institution on which the payment is drawn.
- Each Fixed Rate Conversion is a separate event. You cannot add an additional amount of Principal Balance to a Fixed Rate Conversion after the Fixed Rate Conversion is established.
- The fixed Annual Percentage Rate for each Fixed Rate Conversion will be determined by adding a margin to the Index Rate in effect on the date the Fixed Rate Conversion is requested. The margin shall be determined by us in our sole discretion. The Index Rate published today is 8.000 % per year. Therefore, if you were to request a Fixed Rate Conversion today and obtained a Fixed Rate Conversion with a margin of 8 percentage points, the fixed **"ANNUAL PERCENTAGE RATE"** on the Fixed Rate Conversion would be 16.000 % which is equivalent to a Daily Periodic Rate of .043836%. The Daily Periodic Rate is figured by dividing the Annual Percentage Rate for each day by 365 (366, in any leap year). The **"ANNUAL PERCENTAGE RATE"** on any Fixed Rate Conversion will never be more than 18.000 %. The Annual Percentage Rate does not include charges other than interest. You can call your lender to find out the current fixed Annual Percentage Rate.

- Each Fixed Rate Conversion will be fully amortizing and have its own minimum monthly payment amount. The minimum monthly payment amount for each Fixed Rate Conversion will be the amount of principal plus interest sufficient to repay each Fixed Rate Conversion within a term you select in equal, fully amortizing monthly payments ("Fixed Rate Conversion Minimum Monthly Payment"). The term may not be less than 12 months or more than the then remaining term to the final due date of this Agreement shown on page 1 in the section labeled "Your Promise to Pay". The payment due date (for the Fixed Rate Conversion Minimum Monthly Payment) will be the same as the due date for the Minimum Payment. If you make early or late payments, the Fixed Rate Conversion Minimum Monthly Payment may be more or less than enough to fully repay the Fixed Rate Conversion by the end of the selected term because we continue to accrue interest on unpaid principal for each day any unpaid principal remains outstanding. The last Fixed Rate Conversion Minimum Monthly Payment amount will be adjusted up or down to make up for any difference due to early or late payment.
- The Finance Charge you will pay us for each monthly billing cycle is calculated separately for each Fixed Rate Conversion and for the Principal Balance which has not been converted by a Fixed Rate Conversion. Each Finance Charge is calculated as explained in the section on page 1 labeled "Finance Charge" except that the Daily Periodic Rate and Annual Percentage Rate described in that section will only be applied to the Principal Balance which has not been converted to a Fixed Rate Conversion and the Daily Periodic Rate and Annual Percentage Rate for each Fixed Rate Conversion will be the Daily Periodic Rate and Annual Percentage Rate described above in this section. The sum of the results of these calculations are the total Finance Charge due for each monthly billing cycle.
- The "Total Minimum Payment" due on your Account each month will be the sum of the Fixed Rate Conversion Minimum Monthly Payment plus the Minimum Payment. Making the Minimum Payments and the Fixed Rate Conversion Minimum Monthly Payments may not fully repay the Principal Balance that is outstanding on your Account. On the final due date, you will be required to pay the entire outstanding Account Balance. This payment may be substantially higher than the total payment due on your Account each month and is sometimes referred to as a "balloon" payment.
- Each "Total Minimum Payment" made to us on your Account may first be applied to any billed and unpaid Late Charges, then to any billed and unpaid TCF Command Protection Line charges, then to any billed and unpaid Returned Payment Charges, then to any other billed and unpaid Other Charges you owe, then to each Fixed Rate Conversion Minimum Monthly Payment (applied first to the Finance Charge for the Fixed Rate Conversion and then to principal reduction) beginning with the oldest Fixed Rate Conversion outstanding, then to any billed and unpaid Finance Charges on the Principal Balance which has not been converted to a Fixed Rate Conversion, then to the principal each Fixed Rate Conversion beginning with the oldest Fixed Rate Conversion outstanding, then to the remainder of your Account Balance.
- You may request and establish a Fixed Rate Conversion by calling or visiting your lender. A full disclosure of all the terms of the Fixed Rate Conversion will be provided to you at the time the Fixed Rate Conversion is established.
- Except as modified, amended and changed by this Fixed Rate Conversion section, all the terms of the Agreement apply to Fixed Rate Conversion.

**Loan Advances.** You can use your Account to get a Loan Advance by writing a Check or using your CommandLine Card. Each Loan Advance will be charged against your Account. Transactions with your CommandLine Card are subject to the following daily limits: (1) a maximum of 10 transactions per day; (2) a maximum of $10,000 or your available credit limit whichever is less; and (3) a maximum of $500 or your available credit limit, whichever is less, at automated teller machines ("ATMs") Individual ATMs may not allow withdrawals of up to $500 a day). We may, at our option, authorize and pay any CommandLine Card transaction which exceeds these limits and retain the right to refuse any other CommandLine Card transactions which exceed these limits in the future. Each of you may sign Checks and use the CommandLine Card. You are each fully responsible for Loan Advances even if only one of you signs a Check or uses the CommandLine Card. Loan Advances of any type may not be used to make payment on your Account, including, but not limited to, a payment for any Fixed Rate Conversion. We will not return your Checks to you. If you want copies of any Checks, you will have to pay a fee of $5.00 for each copy. TCF does not charge an access fee for CommandLine Card transactions at TCF Express Teller℠ ATMs. A TCF Express Teller ATM is identified by the name TCF on it. Access or other transaction fees may be imposed by third parties for CommandLine Card transactions at any other location or facility.
**Liability for Unauthorized CommandLine Card Use.** You may be liable for the unauthorized use of your CommandLine Card. You will not be liable for the unauthorized use that occurs after you notify TCF, either orally or in writing at Customer Service, Mail Code 002-01-B, 101 E 5th Street, Suite 101, St. Paul, MN 55101 or by calling (651) 228-8014 or 1-800-929-7332.
**Late and Returned Payment Charges.** If we do not receive the required Total Payment, if any, in full on or before the 10th day after the due date shown on your monthly statement at the Payment Address, we will charge you and you promise to pay a late charge equal to 5% of the Total Payment or $6.24, whichever is more. If the 10th day is a Saturday, Sunday or Legal Holiday, we will not charge you a late charge if we receive the required Minimum Payment in full on the next day that is not a Saturday, Sunday or Legal Holiday. We apply payments in the order in which they are due. No late charge will be assessed on any payment when the only delinquency is due to late fees assessed on earlier payments and the payment is otherwise a full payment. We will not charge you an additional late charge on past due amounts from previous billing cycles. We will charge you and you promise to pay $20 for each check payment you give us and automatic payment withdrawal request or other payment instrument that is returned unpaid.
**Notice Regarding TCF Command Protection Line Provision Purchases.** If you purchase the TCF Command Protection Line provision, you understand that we or an affiliate of ours may receive something of value from the purchase.
**Annual Maintenance Fee.** You promise to pay us each year, in advance, a non-refundable annual maintenance fee of $50.00 for your participation in the CommandCredit Plus Home Equity Line of Credit program. You promise to pay this fee whether or not you use the Account at any time during the year. The maintenance fee due for your first year in the program will be billed with your first monthly statement. The annual maintenance fee will be billed each year thereafter.
**Tax Deductibility.** You should consult a tax advisor regarding the deductibility of interest and charges for your Account.
**Monthly Statements.** We will send you a statement each month you owe us more than $1 or we owe you more than $1, or in which a Finance Charge is imposed. The statement will show information about your Account, including the Total Payment and when it is due.
**Financial Information.** Whenever we ask, you agree to furnish us with current information about the value of any collateral or real estate you have given us as security. You agree that we may report information about your credit with us to others at any time.
**Possible Actions.** We can terminate your Account and require you to immediately pay us the entire outstanding balance in one payment (called "acceleration") if:
- You engage in fraud or material misrepresentation in connection with the Account.
- You do not meet the repayment terms.
- Your action or inaction adversely affects the property that secures your Account or our rights in the property.

We can refuse to make additional extensions of credit or we can reduce your credit limit during any period in which:
- The value of the dwelling securing the Account declines significantly below its appraised value for purposes of the Account.
- We reasonably believe you will not be able to meet the repayment requirements due to a material change in your financial circumstances.
- You are in default of a material obligation in this Agreement.
- Government action prevents us from imposing the Annual Percentage Rate provided for, or impairs our mortgage interest such that the value of the mortgage interest is less than 120 percent of the credit limit.
- A regulatory agency has notified us that continued advances would constitute an unsafe and unsound practice.
- The maximum Annual Percentage Rate is reached.

If the Rate Discount for TCF Checking or Deposit Account box on page 1 is checked, your Annual Percentage Rate will be increased by one-quarter of one percent (.25%) if the TCF Account is closed as provided in that section.

**Other Promises.** You will:

1. Provide us with financing statements at our request;
2. Assist us and do whatever is necessary to perfect any security interest in the collateral or real estate securing this Agreement;
3. Make sure our security interest is properly shown on the certificate of title, if the collateral includes a motor vehicle or other property represented by a certificate of title;
4. Notify us immediately in writing if you change your address; and
5. Not use the collateral or real estate securing this Agreement for any unlawful purpose.

**Your Additional Obligations.** You agree that you will comply with all provisions of any Mortgage or the Security Agreement section of this Agreement given to us to secure your Account. You agree that you will comply with the terms of any other agreement you have with us.

**Attorneys' Fees.** To the extent not prohibited by law, you will pay all of our reasonable court costs and attorneys' fees in collections, foreclosures, and any other legal actions if you are in default. To the extent permitted by the United States Bankruptcy Code, you will also pay the reasonable attorneys' fees and costs we are charged to collect this debt as awarded by any court under the Bankruptcy Code.

**Change of Address.** We will send monthly periodic statements and other notices to you at the address shown for you in our files. You must send us written notice at least 15 days before the end of your monthly billing cycle if you want us to change your billing address. On a joint Account, we will send statements and notices to only one of you. You will notify us immediately in writing if you change your address.

**Our Other Rights.** We can delay enforcement of our rights under this Agreement without losing them. For example, we may accept late payments from you without waiving our right to require that future payments be made on time. If we release any of you from this Agreement, the rest of you will not be released. If we exchange or release any collateral or real estate that secures this Agreement, you will not be released. We do not have to use our legal remedies against one of you before we use our legal remedies against any of you. If we accelerate and you fail to make a payment when due, then we may foreclose or take other action as provided in this Agreement, including the Security Agreement section or the Mortgage. If (1) you do not keep your promises and agreements made in this Agreement, including the Security Agreement section or the Mortgage, or (2) someone (you or anyone else) begins a legal proceeding that may significantly affect our rights in the collateral or real estate ("Property") (such as, for example, a legal proceeding in bankruptcy, or to condemn the Property), then we may, but are not obligated to, take the necessary steps to protect the value of the Property and our rights in the Property. Our actions under this section may include, for example, paying any amount due under any prior mortgage, appearing in court, paying reasonable attorneys' fees, entering on the real estate to make repairs, paying taxes, or paying insurance or Protective Advances under Section 11 of the mortgage securing this Agreement. You promise to pay us all amounts that we pay under this section. If we pay an obligation, we will have all of the rights that the person we paid would have had against you, and the amounts will be added to your Account as a Loan Advance.

**Annual Percentage Rate After Maturity.** The Annual Percentage Rate in effect on the final due date shown on page 1 in the section labeled "Your Promise To Pay" or the date we terminate your Account under the section above labeled "Possible Actions" will continue in effect until your Account is paid in full.

**Agreement Effective.** We have no obligation to make any Loan Advance under this Agreement and you agree not to use your Account until you no longer have the right to rescind this Agreement pursuant to the Federal Truth-in-Lending Act and we are reasonably satisfied you have not rescinded.

**Cancellation and Restriction of Additional Extensions of Credit.** Any one of you can cancel your Account or restrict additional extensions of credit by notifying us in writing. If any one of you restricts additional extensions of credit and any one of you wants to reinstate the Account, all of you are required to request we reinstate and allow additional extensions of credit. We can cancel your Account as allowed under the section labeled "Possible Actions" above. If your Account is canceled, you will have to immediately pay us the full Account Balance amount you owe, including amounts which have not been billed to you yet. We do not have to pay any Check, authorize or pay any CommandLine Card transaction, or make a Loan Advance if your Account is canceled, but if we do, you promise to pay the amount paid, authorized, or advanced as soon as we ask you to.

**Severability.** If any provision of this Agreement is found to be unenforceable, all other provisions will remain in full force and effect.

**Changes and Waivers.** This Agreement cannot be changed unless we agree in writing. We may change the terms of this Agreement if: (1) you specifically agree to the change at the time in writing; (2) the change will unequivocally benefit you; (3) the change is insignificant; or (4) the Index Rate becomes unavailable. You agree to give up your rights to require us to: (1) demand payment of amounts due ("presentment"); (2) obtain official certification of nonpayment ("protest"); (3) notify you that amounts due have not been paid ("notice of dishonor"); or (4) give you any other notice except as required in this Agreement.

**Governing Law.** You agree that this Agreement will be governed and interpreted by federal law applicable to national banks. Federal law governs all fees and charges, including interest, that relate to this Agreement. Under Section 85 of the National Bank Act, TCF refers to Minnesota substantive law to determine the highest rate of interest permissible for any competing lender.

**Service of Process.** If a dispute arises and you file a lawsuit against us, service of process must be made on TCF at the following address: TCF National Bank, Legal Department, 801 Marquette Ave. S. Mail Code 001-01-E, Minneapolis, MN 55402.

**Agreement Binding.** You understand that this Agreement is binding on your heirs and your legal representatives. This Agreement, and any mortgage are the final and complete expression of the agreement between you and us.

---

☐ If this box is checked, the following notice applies:

**NOTICE**

ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER.

---

**CREDIT INFORMATION**

If at any time you feel that any information we may furnish to any consumer reporting agency is inaccurate, you can send us written notice of the inaccurate information to Customer Service, Mail Code 002-01-P, 101 E 5th Street, Suite 101, St. Paul, MN 55101. Please include the account number(s), a description of the inaccurate information, and the nature of the inaccuracy of the information.

## YOUR BILLING RIGHTS
### KEEP THIS NOTICE FOR FUTURE USE

This notice contains important information about your rights and our responsibilities under the Fair Credit Billing Act.

**NOTIFY US IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR BILL**

If you think your bill is wrong, or if you need more information about a transaction on your bill, write us on a separate sheet at the address listed on your bill. Write to us as soon as possible. We must hear from you no later than 60 days after we sent you the first bill on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights.

In your letter, give us the following information:
* Your name and account number.
* The dollar amount of the suspected error.
* Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are not sure about.

If you have authorized us to pay your bill automatically from your savings or checking account, you can stop the payment on any amount you think is wrong. To stop the payment your letter must reach us three business days before the automatic payment is scheduled to occur.

**YOUR RIGHTS AND OUR RESPONSIBILITIES AFTER WE RECEIVE YOUR WRITTEN NOTICE.**

We must acknowledge your letter within 30 days, unless we have corrected the error by then. Within 90 days, we must either correct the error or explain why we believe the bill was correct.

After we receive your letter, we cannot try to collect any amount you question, or report you as delinquent. We can continue to bill you for the amount you question, including Finance Charges, and we can apply any unpaid amount against your credit limit. You do not have to pay any questioned amount while we are investigating but you are still obligated to pay the parts of your bill that are not in question.

If we find that we made a mistake on your bill, you will not have to pay any Finance Charges related to any questioned amount. If we did not make a mistake, you may have to pay Finance Charges, and you will have to make up any missed payments on the questioned amount. In either case, we will send you a statement of the amount you owe and the date that it is due.

If you fail to pay the amount that we think you owe, we may report you as delinquent. However, if our explanation does not satisfy you and you write to us within ten days telling us that you still refuse to pay, we must tell anyone we report you to that you have a question about your bill. And, we must tell you the name of anyone we reported you to. We must tell anyone we report you to that the matter has been settled between us when it finally is.

If we do not follow these rules, we cannot collect the first $50 of the questioned amount, even if your bill was correct.

**SPECIAL RULE FOR COMMANDLINE ® CARD PURCHASES**

If you have a problem with the quality of property or services that you purchased with your CommandLine Card and you have tried in good faith to correct the problem with the merchant, you may have the right not to pay the remaining amount due on the property or services. There are two limitations on this right:

(a) You must have made the purchase in your home state or, if not within your home state, within 100 miles of your current mailing address; and
(b) The purchase price must have been more than $50.

These limitations do not apply if we own or operate the merchant, or if we mailed you the advertisement for the property or services.

---

## NOTICE REGARDING USE OF CREDIT REPORT

If your Agreement is secured by your residence or other residential real estate, the interest rate and amount of this Agreement are based in whole or in part on information obtained from:

| ☐ TransUnion | ☒ Experian | ☒ Equifax |
|---|---|---|
| 2 Baldwin Place | 701 Experian Parkway | PO Box 105873 |
| P.O. Box 1000 | PO Box 2002 | Atlanta, GA 30348 |
| Chester, PA 19022 | Allen, TX 75013-0036 | (800) 685-1111 |
| (800) 888-4213 | (888) 397-3742 | |
| | www.experian.com/reportaccess | |

You have a right under the Fair Credit Reporting Act to know the information contained in your credit file at the consumer reporting agency. The reporting agency played no part in our decision and is unable to supply specific reasons as to how we determined your interest rate or the amount of your loan. You also have a right to a free copy of your report from the reporting agency, if you request it no later than 60 days after you receive this notice. In addition, if you find that any information contained in the report you receive is inaccurate or incomplete, you have the right to dispute the matter with the reporting agency.

By initialing, you acknowledge receipt of this notice on  **05/24/2006**      (date)

_____      _____
Borrower                                                    Co-Borrower
STEVEN F MELDAHL

## TCF®COMMAND PROTECTION LINE PROVISION

If you elect to purchase the TCF Command Protection Line provision, these terms and conditions are included as part of the terms of your Agreement. The monthly fee will not be waived (it will be due) during any deferment period for the deferment events described below. You may obtain Loan Advances during any deferment period per the terms of the Agreement.

<u>Accidental Death Waiver:</u> For the monthly fee described on page 9, TCF will waive your indebtedness (up to $50,000) owing under the Agreement upon death resulting directly, and independently of all other causes, from an accident. An accident is an unplanned event, unexpected and undesigned, which occurs suddenly and at a definite place. The monthly fee will be added to your scheduled monthly payments and will be as an Other Charge, not as a Loan Advance, and will be added to the amount of your scheduled monthly payment.

We agree to waive the entire remaining outstanding balance you owe to us under this Agreement as of the date of your accidental death, up to a maximum amount of $50,000 (this is the maximum waiver under this provision, even if you purchase a joint provision for both borrower and co-borrower), in the event of your accidental death subject to the limitations stated in this TCF Command Protection Line provision. The TCF Command Protection Line provision is also subject to the following exclusions:

- Death resulting from disease, sickness, bodily or mental infirmity, or medical or surgical treatment of same;
- Death resulting from suicide while sane or insane;
- Death resulting from intentionally self-inflicted bodily injury while sane or insane; or
- Death resulting from war or act of war, whether declared or undeclared.

Waiver means that the indebtedness is no longer due to TCF. No payments are made to you or any other party. You, your estate, or heirs may incur a federal, state and/or local income tax as a result of the waiver of indebtedness. Any waiver will be applied in the same manner described in the section on page 2 labeled "Application of Payment". You should consult your tax advisor.

<u>Disability, Involuntary Unemployment, Family Leave and Military Leave Deferment:</u> In addition, for no additional charge, TCF will defer (but not waive) scheduled monthly Minimum Payments during periods of total disability [1], involuntary unemployment [2], family leave [3] or military leave [4]("deferment events") subject to the limitations below. Deferment means that once approved and during an approved period(s) of deferment, you do not need to make your scheduled monthly payment(s). The monthly fee for the TCF Command Protection Line provision will be added to your scheduled monthly payments and will not be waived (will be due) during deferment periods. In addition, the amount due each month for any Escrow Items will be due during deferment periods. **This is a payment deferral feature only-interest will continue to accrue according to this Agreement on the unpaid Principal Balance and the Principal Balance is not reduced.** Because of the deferral, you will have a larger remaining balance due on your scheduled final due date. On the scheduled final due date, you will be required to repay the outstanding balance in a single payment which will include all payments deferred. Deferrals will not cure any prior payment or other delinquency. If any prior delinquency is not cured, we will continue to pursue our remedies based on the prior delinquency and the total outstanding balance, including any payments which have been deferred, may be accelerated. If you pay off your loan before the scheduled final due date, and you have received a deferment of any monthly payment(s), your payoff balance will include the interest that accrued during the deferment period(s) and the remainder of your full unpaid Account Balance including your unpaid Principal Balance.

Here is an example of how the deferral works. Assume you draw $50,000 on your home equity line of credit, make only the Minimum Payment of the greater of $50 or interest only, and take no additional advances during the term of the home equity line of credit, you had a 15-year home equity line of credit at a 7% annual interest rate with an interest begin date of January 1, 2000, a first payment date of February 1, 2000, a final scheduled payment date of January 1, 2015 and did not convert any part of the $50,000 to a Fixed Rate Conversion. If you were ill and could not work for five months beginning January 15, 2002, and a deferment period of 5 months was approved, your scheduled monthly payments for February, March, April, May and June would be deferred. Interest would continue to accrue on your Principal Balance and the Principal Balance of $50,000.00 would stay the same if you did not make any principal payments during the deferral. On January 1, 2015, the final scheduled due date, you would have to pay $1,436.36 in addition to the Principal Balance and the interest owed for the prior month to cover the total of the deferments (the total due would be $51,735.62).

<u>Conditions and Exclusions:</u> Normal pregnancy or self-inflicted injury is not a disability. You must be disabled at least 14 consecutive days to qualify for a disability deferment. You must be completely unemployed for at least 30 consecutive days (if you are employed part-time, you will not qualify) to qualify for a deferment for involuntary unemployment. You must not have been notified, either orally or in writing, or pending layoff, employment termination, strike or lockout prior to the date of this Agreement to qualify for a deferment for involuntary unemployment.

If you qualify for a deferment, you cannot qualify for another deferment for 90 days after the end of the prior deferment event. The maximum total number of months of deferments under this provision is 12 months for disability, 12 months for involuntary unemployment, 6 months for family leave and 6 months for military leave counting all periods of deferment that might occur during the term of this Agreement. The maximum total number of months of deferment during the term of this Agreement for all deferment events counting all periods of deferment that might occur during the term is 24 months.

[1] That is, you must be unable to perform the duties of your occupation for wage or profit because of sickness or accidental injury to qualify for disability deferment.
[2] Involuntary unemployment includes involuntary layoff, termination by employer, and inability to work as a result of a general strike or unionized labor dispute.
[3] Family leave is defined in the Federal Family and Medical Leave Act of 1993.
[4] Military leave is being called to active military duty after the date of this Agreement. If you are on active military duty on the date of this Agreement, military leave deferment is not available unless you leave active military duty and are called back to active military duty.

If you have a preexisting condition - we will not defer any payment with respect to any Loan Advance if you become disabled, and the disability occurs within six months after each Loan Advance and which is caused or substantially contributed to by an illness, injury or condition which required medical advice, diagnosis or treatment within six months prior to each Loan Advance.

You may initiate a waiver or deferment request by calling 800-445-8192 or such other number if we notify you in writing of a different number. Until your request is approved, you must continue to make any scheduled payments which are due. Scheduled payments prior to approval of your request will not be deferred. All deferments will be applied to scheduled payments after the date of our approval of your request. The number of monthly payments approved for deferment is determined by counting the number of full or partial months after the waiting period, if any, is met. Assuming all other requirements are met: for disability requests, a deferral of one monthly payment will be approved for periods of total disability continuing from 14 - 30 days; for Military Leave and Family and Medical Leave Deferments, a deferral of one monthly payment will be approved for a deferment event continuing from 1 - 30 days; and for all types of deferment events, a deferral of two monthly payments will be approved for deferment event periods continuing from 31 - 60 days; a deferral of three monthly payments will be approved for deferment event periods continuing from 61 - 90 days, and so forth (subject to the maximum number of monthly payments eligible for deferment by type and total described in the Conditions and Exclusions section above).

Notice of your request must be furnished within 180 days after death, disability, involuntary unemployment, family leave or military leave occurs, and you must return any forms and provide any information we request within 60 days of our request. We require written proof of accidental death (such as a certified copy of a death certificate). We require written proof of disability, involuntary unemployment, family leave or military leave for the entire period of the deferment event. We reserve the right to require you to give us proof of your continuing disability, involuntary unemployment, family leave or military leave at reasonable intervals in order to justify the continuance of the deferment. We will require information for each type of request you make.

Information we request from you will include, but is not limited to, the following: (A) If requesting accidental death waiver, we must be furnished with a certified copy of the death certificate;  (B) If requesting deferment due to disability, you will be sent an information request form within 15 days after your notice is given (proof of disability must include:  (1) the date and the cause of the total disability; and (2) signature of treating physician);  (C) If requesting deferment due to a period of involuntary unemployment, you must qualify for unemployment benefits under state unemployment law and register to work with a state employment office or a recognized employment agency within fifteen (15) days after the last day employed and remain so registered during the request period if the unemployment occurred as a result of either layoff or employer termination (in the event registration occurs after the first fifteen (15) days of unemployment, you will not be eligible for payment deferment for the time in which you were not registered, but requests will be processed retroactively to the date of registration); (D) If requesting deferment due to family leave, we must be furnished with a copy of your employer's grant of family leave under the Federal Family and Medical Leave Act of 1993 (if your employer is not subject to the Federal Family and Medical Leave Act of 1993 we will require documentation from your employer similar to that required by the Act); and (E) If requesting deferment due to military leave, we must be furnished with a copy of your orders to active duty.

<u>Eligibility for Features (subject to the limitations in this TCF Command Protection Line provision):</u>

**If you are employed,** (30 hours or more a week and received a form W-2), you are eligible for all five features (accidental death waiver, involuntary unemployment deferment, disability deferment, family leave deferment and military leave deferment) on the date of your Agreement.

**If you are self-employed,** you are eligible for the accidental death waiver, and the disability, family leave and military leave deferment features, but not the involuntary unemployment deferment feature on the date of this Agreement. However, if you become employed (30 hours or more a week and receive a form W-2) at any time during the term of this Agreement, you become eligible for the involuntary unemployment deferment feature for a future period. You may then request to defer your monthly payment obligation for a future period of involuntary unemployment.

**If you are unemployed, disabled, or retired,** you are eligible for the accidental death waiver and military leave deferment features, but not the involuntary unemployment, disability, and family leave deferment features on the date of this Agreement. However, if you become employed (30 hours or more a week and receive a form W-2) at any time during the term of this Agreement, you become eligible for the involuntary unemployment, disability and family leave deferment features for a future period. You may then request to defer your scheduled monthly payment obligation for a future period of involuntary unemployment, for a future period of disability, or for a future period of family leave.

**Refinanced Agreement:** If the TCF Command Protection Line Provision is purchased as part of this Agreement, and this Agreement refinances an existing TCF loan agreement ("old loan") where a TCF Command Protection Line Provision or Debt Waiver Provision was purchased, then any deferment event which existed at the time of this Agreement ("preexisting event") will be eligible for deferment under this Agreement without regard to the limitations for prior deferments or preexisting conditions discussed in the Conditions and Exclusions section above.  In addition, the total number of permitted monthly payments eligible for deferments for this Agreement by type and for purposes of the maximum total number of deferments for all deferment events are reduced by the number of monthly payments deferred for the preexisting event on the old loan.

**THE FOLLOWING TABLE SUMMARIZES THE ABOVE ELIGIBILITY REQUIREMENTS.  THE 'X' REPRESENTS WHICH FEATURE(S) YOU ARE ELIGIBLE TO RECEIVE AT THE DATE OF THIS TCF COMMAND PROTECTION LINE PROVISION.**

|  | Accidental Death Waiver | Disability Feature | Involuntary Unemployment Feature | Family Leave Feature | Military Leave Feature |
|---|---|---|---|---|---|
| Fully Employed | X | X | X | X | X |
| Self Employed | X | X |  | X | X |
| Unemployed | X |  |  |  | X |
| Disabled | X |  |  |  | X |
| Retired | X |  |  |  | X |

STEVEN F MELDAHL

**Employment Status**
I have NOT been notified, either orally or in writing, of pending layoff, employment termination, strike or lockout and my employment status at the present time is:

| Borrower | Co-Borrower |
|---|---|
| ☐ Fully Employed | ☐ Fully Employed |
| ☐ Unemployed | ☐ Unemployed |
| ☐ Retired | ☐ Retired |
| ☐ Self-employed | ☐ Self-employed |
| ☐ Disabled | ☐ Disabled |

IF YOU MISSTATE ANY OF THE ABOVE INFORMATION, TCF MAY NOT BE OBLIGATED UNDER THE TCF COMMAND PROTECTION LINE PROVISION.

All statements by you for the TCF Command Protection Line provision have been made to the best of your knowledge and belief. After 2 years from the date of this Agreement, no statement made by you for the TCF Command Protection Line provision can be used to void the TCF Command Protection Line provision or to deny any accidental death waiver or payment deferral request unless that statement was made fraudulently. Prior to that time and at any time if a statement was fraudulently made by you, we may use the statements by you to void the TCF Command Protection Line provision or deny any accidental death waiver or payment deferral request.

---

**TCF COMMAND PROTECTION LINE PROVISION NOTICE**

THE TCF COMMAND PROTECTION LINE PROVISION IS NOT REQUIRED TO OBTAIN CREDIT, AND WILL NOT BE PROVIDED UNLESS YOU SIGN AND AGREE TO PAY THE ADDITIONAL COST. ONLY THE BORROWER(S) SHOWN BELOW ARE INCLUDED.

BASED ON THE INFORMATION YOU HAVE PROVIDED TO US, UNLESS THE PROVISION IS CANCELED, THE MONTHLY FEE FOR THE TCF COMMAND PROTECTION LINE PROVISION IS $0.008219 PER $100 OF THE ACCOUNT BALANCE PER DAY FOR ACCOUNT BALANCES OF $10,000 OR MORE AND $0.001643 PER $100 OF THE ACCOUNT BALANCE PER DAY FOR ACCOUNT BALANCES OF LESS THAN $10,000 WITH A MAXIMUM TOTAL MONTHLY FEE OF $25 EACH MONTH OF THE TERM OF THIS AGREEMENT FOR THE BORROWER ($0.011506 PER $100 OF THE ACCOUNT BALANCE PER DAY FOR ACCOUNT BALANCES OF $10,000 OR MORE AND $0.002301 PER $100 OF ACCOUNT BALANCE PER DAY FOR ACCOUNT BALANCES OF LESS THAN $10,000 WITH A MAXIMUM TOTAL MONTHLY FEE OF $35 EACH MONTH OF THE TERM OF THIS AGREEMENT IF YOU ARE PURCHASING A JOINT PROVISION FOR THE BORROWER AND CO-BORROWER). THE TOTAL MONTHLY FEE IS CALCULATED BY ADDING EACH OF THE DAILY AMOUNTS FOR ALL DAYS OF THE MONTH. THE TOTAL MONTHLY FEE WILL BE ADDED TO THE AMOUNT YOU OWE AND YOUR MONTHLY PAYMENT AS AN OTHER CHARGE AND NOT AS A LOAN ADVANCE.

☐ I/We want the TCF Command Protection Line provision for Borrower only.
☐ I/We want the TCF Command Protection Line provision for both Borrower and Co-Borrower.
☒ I/We decline the TCF Command Protection Line provision.

**AMOUNT OF ACCIDENTAL DEATH WAIVER:** The amount of the accidental death waiver may be less than the amount you owe under your Agreement. You understand that we will waive only up to a maximum of $50,000 in the event of borrower's (or co-borrower's if applicable) accidental death. If your Account Balance exceeds the amount subject to waiver stated above, the excess will still be due in the event of your accidental death. ☐ You understand that your Credit Limit exceeds this maximum amount. This means that you (or your estate) may owe a balance on this Agreement even after the death waiver is applied to your Account Balance.
**CANCELLATION/TERMINATION:** You may cancel the TCF Command Protection Line provision at any time. We may cancel the TCF Command Protection Line provision if your Agreement becomes 150 days delinquent or we charge off your Agreement.
**DEFERRAL FEATURES:** You understand that the disability, involuntary unemployment, family leave and military leave features are deferrals and not waivers. You understand that you will still have to pay the payments deferred, that interest continues to accrue during the deferral period(s), and that no principal is reduced by the deferral(s). This means that your final payment will be increased by the payments deferred. You understand that the TCF Command Protection Line provision only allows 12 total months of deferment for disability, 12 total months of deferment for involuntary unemployment, 6 total months of deferment for family leave and 6 total months of deferment for military leave during the term of this Agreement. The 12-month and 6-month limits include all periods of deferment that occur during the term of this Agreement. In addition, you understand the TCF Command Protection Line provision only allows a total of 24 months of deferment for all deferment events.
**REFUND:** You understand that the monthly fee is billed at the end of each period to which it applies (in arrears). If you prepay your Agreement, a fee will be charged for the days elapsed from the last scheduled payment due date to the date of prepayment, but no fee will be charged for days after the date of prepayment. Therefore, no portion of the fee will be refunded in the event you prepay the Agreement in full because no portion of the fee for the TCF Command Protection Line provision is unearned.
**ELECTION:** By signing below, you state that you DO want the TCF Command Protection Line provision for the borrower(s) indicated by the box checked above. You also state that you have received a filled-in copy of this form before signing it. You also state that you understand you, your estate, or heirs may incur a federal, state and/or local income tax as a result of the waiver of the indebtedness and that you should consult your tax advisor.

---

Borrower _____  Date _____  Co-Borrower _____  Date _____

By signing below, you state that you DO NOT want the TCF Command Protection Line provision.

Borrower _____  5-24-06  Date _____  Co-Borrower _____  Date _____
STEVEN F MELDAHL



**Doc No 4276178  06/27/2006 02:00 PM**
Certified filed and or recorded on above date:
Office of the Registrar of Titles
Hennepin County, Minnesota
Michael H. Cunniff, Registrar of Titles
TransID 232932

| New cert | Cert | Deputy 16 |
|---|---|---|
| | 1067363 | Fees |

$1.50 AF
$5.00 ConsFee
$10.50 STATEFEE
$34.00 TMTGFEE
$0.00 TSUR
$51.00 Total

SCANNED

1876855



106736 3

After recording, please return to:
TCF National Bank
Attn: Lien Perfections 002-01-P
101 E 5th Street, Suite 101
St. Paul, MN 55101

Henn Co    MRT
ULV    # 108525
6/7/2006
Paid    $1,200.00
Account Number: ▓▓▓▓▓▓

## COMMANDCREDIT PLUS ® MORTGAGE

**TCF NATIONAL BANK**
**MINNESOTA CONSUMER LENDING DEPARTMENT**

**THIS MORTGAGE ("Mortgage") SECURES A REVOLVING LINE OF CREDIT UNDER WHICH ADVANCES, PAYMENTS, AND READVANCES MAY BE MADE FROM TIME TO TIME. NOTWITHSTANDING ANYTHING TO THE CONTRARY HEREIN, THE MAXIMUM PRINCIPAL INDEBTEDNESS SECURED BY THIS MORTGAGE AT ANY ONE TIME IS**
FIVE HUNDRED THOUSAND DOLLARS AND 00 CENTS
Dollars ($500,000.00 ). This Mortgage is made this 24th day of May, 2006 , by
STEVEN F MELDAHL AS TRUSTEE UNDER THE STEVEN F MELDAHL
LIVING TRUST DATED MAY 18, 2001 whose address is
7409 HYDE PARK DRIVE EDINA MN 55439
(the "Borrower"), who grants, conveys, mortgages and warrants to TCF National Bank, a national banking association, 801 Marquette Avenue, Minneapolis, Minnesota 55402 (the "Lender"), land and property in Hennepin County, Minnesota, described as:

18 7685 5

RETURN TO:
GENERAL AMERICAN CORP
BOX 70

SEE SCHEDULE "A"
street address 7409 HYDE PARK DRIVE EDINA MN 55439
property identification no. 0811621320035

together with all buildings, improvements, and fixtures on the property, whether now on the property or added in the future, and all easements and other rights that pertain to the property (collectively the "Property"). This Mortgage secures performance and payment under the terms of the CommandCredit Plus Home Equity Line of Credit Agreement and Disclosure Statement dated the same date as the Mortgage, subject to any amendment as permitted by its terms ("Agreement"). In addition to the indebtedness due under the Agreement, this Mortgage secures Protective Advances which may be in excess of the maximum principal amount stated above, with interest thereon and any other charges owing under the Agreement (collectively "Debt") and the performance of all covenants and agreements of the Borrower contained herein. "Protective Advance" is defined as a payment made by Lender for performance of covenants of Borrower pertaining to insuring or preserving the Property upon Borrower's failure to perform. The interest rate under the Borrower's Agreement is variable and can change daily, as described in the Agreement. The full Debt, if not paid earlier, is due and payable on 05/29/2046.

Borrower promises and agrees:
1. To keep the Property in good repair, and to also comply with all laws and ordinances, which affect the Property.
2. To pay all taxes, assessments, and water bills levied on the Property and any other amounts which could become a senior Security Interest against the Property. "Security Interest" includes any lien, mortgage or other encumbrance.
3. To perform all obligations under any Security Interest on the Property. As of the date hereof, there exists no other Security Interest on the Property, other than as disclosed to Lender on the title insurance commitment or property report or other title evidence obtained by Lender prior to accepting this Mortgage, or on Borrower's loan application.
4. To keep the Property insured against fire, windstorm, flood, and such other hazards as Lender may require, in an amount and manner acceptable to Lender, and with the proceeds made payable in the policies to Lender as mortgagee, and to deliver such proof of insurance as Lender may require. Borrower may obtain insurance from the insurance company of Borrower's choice as long as the insurance company is reasonably acceptable to Lender. Lender will apply any insurance proceeds to pay the Debt, unless Lender agrees in writing that the proceeds can be used differently. If Lender uses the proceeds to reduce the Debt, Borrower will still have to make regular monthly payments until the Debt is satisfied. If Borrower fails to keep the Property insured, Lender may, but is not required to, obtain such insurance to protect Lender's interest. Such insurance obtained by Lender may not protect Borrower's equity interest in the Property. Lender is not required to obtain the lowest cost insurance that might be available.
5. That if all or part of the Property is condemned or taken by eminent domain, Borrower directs the party condemning or taking the Property to pay all of the money to Lender. Lender will apply the money to pay the Debt, unless Lender agrees in writing that the money can be used differently. If Lender uses the money to reduce the Debt, Borrower will still have to make regular monthly payments until the Debt is satisfied.

**EXHIBIT**
**B**

099066                                    page 1 of 4        5/05

4276178

6. That if Borrower fails to pay or perform any of Borrower's obligations under this Mortgage, Lender may pay or perform such obligations. Any amount so paid, and the cost of any title search and report made after any Default, may be added to the Debt as a Protective Advance.

7. That the term "Default" means (a) Borrower's failure to comply with the terms of this Mortgage such that Lender may take action as stated in the Possible Actions section of the Agreement; or (b) Borrower's failure to comply with the terms of the Agreement such that Lender may terminate the Account as stated in the Agreement; or (c) Borrower's failure to comply with the terms of any Security Interest having priority over this Mortgage such that Lender may take action as stated in the Possible Actions section of the Agreement.

   The term "Lender" includes Lender's successors and assigns, and the term "Borrower" includes and binds the heirs, personal and legal representatives, successors, and assigns of the undersigned. If this Mortgage is signed by two or more persons, the obligations and Security Interest granted by this Mortgage shall be cumulative and in addition to any other remedies provided by law. Each person that signs this Mortgage is responsible for keeping all of the promises made by Borrower. Lender may choose to enforce its rights against any person signing this Mortgage or against all of them. However, if someone signed this Mortgage, but signed the Agreement as collateral owner only, then that person will not be required to pay any amount under the Agreement, but will have signed only to grant, convey, mortgage and warrant any rights that person has in the Property. Also, Borrower may agree to extend, modify, forbear, or make any accommodations with regard to the Agreement or Mortgage without such collateral owner's consent.

8. That Lender shall have a power of sale. This means that if the Borrower is in Default, Lender is authorized and empowered to require immediate repayment of the Debt (called "acceleration"). The Lender may (and is hereby authorized and empowered to) foreclose this Mortgage by action or advertisement, pursuant to the Statutes of the State of Minnesota in such case made and provided, power being expressly granted to sell the Property at public auction and convey the same to the purchaser in fee simple and, out of the proceeds arising from such sale, to pay the Debt with interest, and all legal costs and charges of such foreclosure and the maximum attorneys' fees permitted by law, which costs, charges, and fees the Borrower agrees to pay. However, before accelerating, Lender will send Borrower a written notice by certified mail which states:

   a. The promise that Borrower failed to keep or the representation or warranty that Borrower breached;
   b. The action Borrower must take to correct that failure;
   c. The date, at least 30 days away, by which the failure must be corrected;
   d. That if Borrower doesn't correct the failure or the representation or warranty that Borrower breached, Lender will accelerate, and if Borrower doesn't pay, Lender or another person may buy the Property at a foreclosure sale;
   e. That Minnesota law allows Borrower to reinstate the Mortgage after acceleration; and
   f. That Borrower may bring suit in court to argue that all promises were kept and to present any other defenses Borrower has to acceleration.

   We will send this notice and any other notice required by the Mortgage or law to your address on file with us unless the law requires a different address.

   Lender need not send the notice if the promise Borrower failed to keep consists of Borrower's sale or transfer of all or a part of the Property or any rights in the Property without Lender's written consent. If Borrower does not correct the failure by the date stated in the notice, Lender may accelerate. If Lender accelerates, Lender may foreclose this Mortgage according to the Minnesota Statutes. Borrower gives Lender a power to sell the Property at a public auction. Borrower also agrees to pay Lender's attorneys' fees for the foreclosure in the maximum amount allowed by law. Lender may retain from the proceeds of the sale the amount of the Debt outstanding, the costs and charges of such sale, and reasonable attorneys' fees provided by Minnesota Statutes, and then render the surplus monies, if any, as required by law. In the event of any foreclosure or other sale under this Mortgage by virtue of judicial proceedings, advertisement, or otherwise, the Property may be sold in one parcel and as an entirety, or in such parcels, manner, or order as Lender in its sole discretion may elect.

9. That Borrower shall not assign or transfer the Property or any beneficial interest in the Property by deed, bond for deed, contract for deed, installment sales contract, escrow agreement, or other instruments, or in any manner whatsoever, without Lender's prior written consent. Lender's written consent is not required in the following circumstances:

   (a) the creation of a lien or other encumbrance subordinate to Lender's Security Interest which does not relate to a transfer of rights of occupancy in the Property (provided that such lien or encumbrance is not created pursuant to a contract for deed);
   (b) the creation of a purchase-money Security Interest for household appliances;
   (c) a transfer by devise, descent, or operation of law on the death of a joint tenant or tenant by the entirety;
   (d) the granting of a leasehold interest which has a term of three years or less and which does not contain an option to purchase (that is, either a lease of more than three years or a lease with an option to purchase violates this provision);
   (e) a transfer, in which the transferee is a person who occupies or will occupy the property, which is:
       (i) a transfer to a relative resulting from the death of Borrower;
       (ii) a transfer where the spouse or child(ren) becomes an owner of the Property; or
       (iii) a transfer resulting from a decree of dissolution of marriage, legal separation agreement, or from an incidental property settlement agreement by which the spouse becomes an owner of the Property; or
   (f) a transfer into an inter vivos trust in which Borrower is and remains the beneficiary and occupant of the Property, unless, as a condition precedent to such transfer, Borrower refuses to provide Lender with reasonable means acceptable to Lender by which Lender will be assured of timely notice of any subsequent transfer of the beneficial interest or change in occupancy.

10. That Lender or its agent may make reasonable entries upon and inspections of the Property. Lender shall give Borrower notice at the time of or prior to an inspection specifying reasonable cause for the inspection.

11. That the Borrower shall pay to Lender on the day the Minimum Payments are due under the Agreement, until the Agreement is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over the Mortgage as a lien or encumbrance on the Property; and (b) premiums for any and all flood insurance required by Lender, if any. These items are called "Escrow Items." At origination or at any time during the term of the Agreement, Lender may require that Borrower provide escrow for hazard insurance premiums, Community Association Dues, Fees, and Assessments, if any, and such premiums, dues, fees and assessments shall be an Escrow Item.

Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section 11. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be an obligation of the Borrower in this Mortgage, as the phrase is used in Section 6. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 6 and pay such amount and Borrower shall then be obligated under Section 6 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a written notice to Borrower by Lender and, upon such revocation, Borrower shall pay to Lender Funds, in such amounts that are then required under this Section 11.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with the law governing the Agreement.

The Funds may be commingled with other funds of the Lender. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Unless an agreement is made in writing, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Mortgage, Lender shall promptly refund to Borrower any Funds held by Lender.

12. That if the loan secured by this Mortgage is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charge collected or to be collected in connection with the loan exceeds the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the outstanding Debt or by making a direct payment to Borrower.

13. That this Mortgage, and any actions arising out of this Mortgage, are governed by Minnesota law to the extent not preempted by federal law. If any provision of this Mortgage is found to be unenforceable, all other provisions will remain in full force and effect. Lender's failure to exercise any right or remedy under this Mortgage will not waive Lender's rights in the future.

14. That Borrower gives up the homestead exemption right for all claims arising out of this Mortgage. This includes Borrower's right to demand that property other than Borrower's homestead that has been mortgaged to Lender be foreclosed before the homestead is foreclosed. Under the homestead exemption law, Borrower's homestead is usually free from the claims of creditors.

**Riders.** The following Riders are to be executed by the Borrower:
☐ Condominium Rider        ☐ Planned Unit Development Rider

Borrower shall be given one conformed copy of the Agreement and this Mortgage.
BY SIGNING BELOW, BORROWER HAS SIGNED AND DELIVERED THIS MORTGAGE AS OF THE
DATE FIRST WRITTEN ABOVE.

Borrower:

_Steven F. L—fraske_
(signature)                                        (signature)

STEVEN F MELDAHL , TRUSTEE
_____          _____
(type or very clearly print name)            (type or very clearly print name)

STATE OF MINNESOTA              )
                                ) ss.
COUNTY OF    RAMSEY             )

The above instrument was acknowledged before me this  24th   day of    May , 2006              , by
STEVEN F MELDAHL AS TRUSTEE UNDER THE STEVEN F MELDAHL
LIVING TRUST DATED MAY 18, 2001

                                        _Susan K. Gieseke_
                                        NOTARY PUBLIC
                                                County,
                                        My commission expires:

This instrument was drafted by:
        TCF National Bank
        Consumer Lending Department
        801 Marquette Avenue
        Minneapolis, MN  55402

        SUSAN K. GIESEKE
        NOTARY PUBLIC-MINNESOTA
        My Commission Expires Jan. 31, 2010

099066        page 4 of 4      5/05

SCHEDULE "A"

70-01876855

LOT 6, BLOCK 1, HYDE PARK SECOND ADDITION, HENNEPIN COUNTY, MINNESOTA.

TORRENS PROPERTY, Certificate of Title No. 1067363.

TAX ID NO. 08-116-21-32-0035.

## TCF EXHIBIT C

| Property Address | Debtor Value | Tax Value | Liens | Owner |
|---|---|---|---|---|
| 2417 24th Ave N. | 35500 | 50500 | 0 | Meldahl |
| 3709 2nd Ave S. | 85000 | 100000 | 322000+14111 | Meldahl |
| 1715 Thomas Ave N. | 50000 | 80500 | 0 | Trustee |
| 2610 Irving Ave N. | 30000 | 54000 | 0 | Trustee |
| 421 Morgan Ave N. | 30000 | 71500 | 11733 | Trustee |
| 819 Newton Ave. N | 30000 | 57500 | 0 | Trustee |
| 2807 Knox Ave N. | 30000 | 68000 | 8241 | Trustee |
| 2931 Oliver Ave N. | 30000 | 65000 | 0 | Trustee |
| 317 23rd Ave. N. | 25000 | 55000 | 0 | Trustee |
| 2442 15th Ave S. | 105000 | 124000 | 322000+14111 | Meldahl |
| 1646 Washburn Ave. N. | 30000 | 69500 | 0 | Trustee |
| 2306 James Ave N. | 25000 | 56500 | 16789 | Trustee |
| 810 Newton Ave N. | 30000 | 66500 | 0 | Trustee |
| 528 Morgan Ave N. | 45000 | 71500 | 250000 | Trustee |
| 1523 Morgan Ave. N. | 30000 | 56500 | 0 | Trustee |
| 425 24th Ave N. | 30000 | 88000 | 43125+9644 | Trustee |
| 4220 Irving Ave N. | 40000 | 75000 | 0 | Trustee |
| 321 31st Ave. N. | 45000 | 68000 | 50000 | Trustee |
| 2219 29th Ave. N. | 30000 | 49000 | 0 | Trustee |
| 2319 Aldrich Ave. N | 45000 | 61000 | 250000 | Trustee |
| 2634 13th Ave N. | 40000 | 106000 | 9036 | Trustee |
| 1714 Queen Ave. N. | 60000 | 72000 | 11445 | Trustee |
| 2942 Dupont Ave N. | 40000 | 58000 | 13217 | Trustee |
| 2539 12th Ave S. | 30000 | 92000 | 0 | Trustee |
| 3115 Thomas Ave. N. | 30000 | 67500 | 0 | Trustee |
| 2315 Aldrich Ave. N. | 35000 | 57000 | 0 | Trustee |
| 3311 Oakland Ave. S | 119000 | 119000 | 176000 | Trustee |
| 2815 14th Ave. S | 50000 | 99000 | 43125+9644 | Trustee |
| 3507 Morgan Ave. N. | 20000 | 43000 | 0 | Meldahl |
| 2018 11th Ave. S. | 50000 | 102500 | 176000 | Meldahl |
| 3455 James Ave. N. | 50000 | 63500 | 0 | Trustee |
| 1518 Thomas Ave. N. | 50000 | 64500 | 13166 | Trustee |
| 3019 Colfax Ave. N. | 30000 | 41000 | 0 | Trustee |
| 2414 Logan Ave. N. | 45000 | 56500 | 250000 | Meldahl |
| 1223 26th Ave. N | 5000 | 21600 | 0 | Trustee |
|  |  |  |  | Bk of New Yo |
| 3015 Colfax Ave. N. | 25000 | 48500 | 0 | Trustee |
| 1410 Newton Ave N. | 30000 | 49500 | 0 | Meldahl |
| 2923 Olive Ave. N. | 30000 | 58500 | 0 | Meldahl |
| 3019 Upton Ave. N. | 20000 | 60500 | 0 | Meldahl |
| 3111 Upton Ave. N. | 35000 | 55500 | 0 | Meldahl |
| 1425 Upton Ave N | 25000 | 27000 | 0 | Meldahl |

| Address | | | | |
|---|---|---|---|---|
| 2955 Colfax Ave N. | 30000 | 34200 | 0 | Meldahl |
| 3906 Emerson Ave. N. | 30000 | 40500 | 14192 | Meldahl |
| 2711 Fremont Ave. N. | 30000 | 70000 | 0 | Meldahl |
| 2819 Fremont Ave. N | 25000 | 53000 | 0 | Meldahl |
| 2322 Irving Ave. N. | 35000 | 60500 | 0 | Meldahl |
| 2623 Irving Ave.N. | 35000 | 73000 | 0 | Meldahl |
| 3335 Oliver Ave. N. | 40000 | | 0 | Meldahl |
| 2735 Queen Ave. N | 35000 | 56500 | 0 | Meldahl |
| 916 30th Ave.N. | 35000 | 48500 | 0 | Meldahl |
| 1415 14th Ave. N. | 30000 | 60000 | 0 | MERS |
| 1711 25th Ave. N | 35000 | 47700 | 0 | Meldahl |
| 3345 6th St. N. | 30000 | 71500 | 0 | Meldahl |
| 3701 6th St. N. | 35000 | 76000 | 11366 | Meldahl |
| 3725 6th St. N. | 25000 | 57000 | 0 | Meldahl |
| 3111 Newton Ave. N. | 31500 | 31500 | 0 | Meldahl |
| 7409 Hyde Park Dr. | 414000 | 445200 | 560000 | Trustee |
| 1110 27th Ave. N. | 25000 | 48500 | 0 | Meldahl |
| 3210 Upton Ave. N. | 8000 | 25000 | 0 | Meldahl |
| 2926 Oliver Ave. N. | 30000 | 64500 | 0 | Meldahl |
| 2622 Irving Ave. N. | 25000 | | 0 | Meldahl |
| 3451 James Ave. N. | 25000 | 45000 | 0 | Meldahl |
| 3611 Queen Ave. N. | 30000 | 30000 | 0 | Meldahl |
| 3743 Bryant Ave. N. | 30000 | 35000 | 0 | Meldahl |
| 3313 Lyndale Ave. N. | 30000 | 30000 | 0 | Meldahl |
| 2411 Irving Ave. N. | 25000 | 31500 | 0 | Meldahl |
| 1411 24th Ave. N. | 25000 | 20000 | 0 | Meldahl |
| 2946 Colfax Ave. N. | 30000 | 68000 | 0 | Meldahl |
| 4411 Aldrich Ave. N. | 40000 | 55000 | 250000 | Meldahl |
| 3215 Knox Ave. N. | 30000 | 35000 | 0 | Meldahl |
| 1000 Logan Ave. N. | 25000 | 44500 | 0 | Meldahl |
| 2958 Russell Ave. N. | 30000 | 60500 | 0 | Meldahl |
| 2500 Humboldt Ave. N. | 10000 | 40500 | 25005 | Meldahl |
| 2805 Oliver Ave. N. | 25000 | 40500 | 0 | Deutcheban... |
| 1118 24th Ave. N. | 22500 | 22500 | 0 | Meldahl |
| 3723 Fremont Ave. N. | 30000 | 30000 | 0 | Meldahl |
| 323 30th Ave N. | 35000 | 48500 | 0 | Meldahl |
| 2900 Queen Ave. N. | 35000 | 69000 | 0 | Meldahl |
| 723 Newton Ave. N. | 30000 | 31500 | 0 | Meldahl |
| 3446 Oliver Ave. N. | 30000 | 72000 | 0 | Meldahl |
| 2811 Newton Ave. N. | 28000 | 22500 | 0 | Meldahl |
| | 3168500 | 4944700 | | |

$4,944,700 - 3,168,500 = 1,831,200$